UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
MAGGALEAN MOSBY,   **COMPLAINT**

    **20 cv 1485**

    **ECF Case**

    Plaintiff,

    v.

The CITY OF NEW YORK,
POLICE OFFICER JOSEPH ALIBERTI,
POLICE OFFICER LUIGI TIRRO,
and POLICE OFFICER JOHN DOE    **JURY TRIAL DEMANDED**
in their individual and official capacities,

    Defendants.
-------------------------------------------------------------x

Plaintiff Maggalean Mosby ("Plaintiff" or "Ms. Mosby"), by her attorney, Cyrus Joubin, complaining of the Defendants, respectfully alleges as follows:

## PRELIMINARY STATEMENT

1. This action arises from various civil rights violations against Ms. Mosby by New York City police officers from the 1st Precinct in Manhattan. Ms. Mosby asserts constitutional claims pursuant to 42 U.S.C. § 1983 ("Section 1983") against the individual defendants for false arrest, excessive force, denial of the right to a fair trial, failure to intervene, and a *Monell* claim against the City of New York for the same constitutional violations. Ms. Mosby seeks compensatory and punitive damages, costs, disbursements, and attorney's fees pursuant to applicable state and federal civil rights law.

## JURISDICTION

2. This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 and

the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343 (a)(3) and (a)(4), this being an action seeking redress for the violation of Plaintiff's constitutional and civil rights.

## VENUE

3.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because the acts complained of occurred in this district.

## JURY DEMAND

4.     Plaintiff respectfully demands a trial by jury on each and every one of her claims as pled herein, pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

5.     The individually named defendants Police Officer Joseph Aliberti (Shield #13609) ("PO Aliberti"), Police Officer Luigi Tirro (Shield #05819) ("PO Tirro"), and Police Officer John Doe ("PO Doe") (collectively, the "individual defendants") are and were at all times relevant herein officers, employees and agents of the New York City Police Department ("NYPD").

6.     On the date of the incident giving rise to this complaint, the individual defendants were assigned to the NYPD 1st Precinct.

7.     Each individual defendant is sued in his or her individual and official capacity.  At all times mentioned herein, each individual defendant acted under the color of state law, in the capacity of an officer, employee, and agent of defendant City of New York ("Defendant City").

8. Defendant City is a municipality created and authorized under the laws of New York State. It is authorized by law to maintain, direct, and to supervise the NYPD, which acts as its law enforcement agent and for which it is ultimately responsible.

## STATEMENT OF FACTS

9. On the evening of October 4, 2018, Ms. Mosby went with her friend Geraldine Jeanty ("Ms. Jeanty") to TGI Friday's restaurant at 47 Broadway in lower Manhattan.

10. Ms. Mosby and Ms. Jeanty sat and ate together at a booth on an elevated section of the restaurant; this elevated section was reachable by stairs from the main level.

11. Around 10 p.m., a man at the bar began arguing with the restaurant staff over a bill.

12. The restaurant manager called the police because the man wouldn't pay the bill.

13. The man – who appeared intoxicated – became combative with the manager, and a heated argument erupted between the man and other patrons of the restaurant as well.

14. Three male police officers – PO Tirro, PO Aliberti, and PO Doe – came into the restaurant in response to the manager's 911 call.

15. The heated scene in the restaurant continued even while the officers were there.

16. In the presence of the officers, the combative man spit at a woman who was trying to tell him to calm down.

17. Ms. Jeanty went down the stairs to the main level of the restaurant and admonished the man for spitting at the woman.

18. Ms. Mosby remained on the elevated section of the restaurant amidst this commotion.

19. The officers arrested the combative man along with Ms. Jeanty.

20. Ms. Mosby got up from her table and, to get a better view of what was going on, moved to the stairs that separated the main floor of the restaurant from the elevated section where she had been sitting.

21. After Ms. Mosby got to the stairs, PO Tirro suddenly grabbed her and slammed her to the floor, using his foot to pin her to the floor, causing significant pain to Ms. Mosby's arms and neck.

22. After Ms. Mosby was on the floor for a period of time, PO Tirro lifted her up, handcuffed her behind her back, and seated her on a chair.

23. Ms. Mosby had done nothing unlawful or suspicious to justify an arrest.

24. When Ms. Mosby asked why she was under arrest, PO Tirro replied, "Don't worry about it right now."

25. Ms. Mosby did not resist arrest in any way, did not behave aggressively toward the officers in any way, and did not interfere with their work in any way.

26. Ms. Mosby was removed from the restaurant in handcuffs along with Ms. Jeanty and the combative man.

27. Ms. Mosby was driven to the 1st Precinct, where she was booked and processed.

28. PO Tirro, PO Aliberti, and PO Doe concocted false allegations against Ms. Mosby – portraying her as physically aggressive and uncooperative – and forwarded this false information to the New York County District Attorney's Office.

29. Ms. Mosby was then transported to Central Booking in lower Manhattan.

30. On the evening of October 5, Ms. Mosby was arraigned in New York County Criminal Court, at 100 Centre Street, in connection with Docket No. 2018NY039876.

31. She was charged with Obstructing Governmental Administration in the Second Degree, Resisting Arrest, and Harassment in the Second Degree.

32. The Criminal Court Complaint was based on a complete fabrication – namely, the false allegations that the individual defendants had concocted about her conduct in the restaurant.

33. Specifically, as falsely alleged by PO Aliberti and PO Tirro, Ms. Mosby "jump[ed] onto Officer Tirro's back while screaming" and, while being arrested, she "twist[ed] her body…kick[ed] her legs, and move[d] her arms up and down while refusing to place her hands behind her back despite several requests to do so."

34. The Criminal Court Judge released Ms. Mosby on her own recognizance and ordered her to return to Court on November 13, 2018.

35. On November 13, Ms. Mosby resolved her case with an Adjournment in Contemplation of Dismissal ("ACD"), resulting in a full dismissal six months later.

36. As a result of the above-described conduct by the individual defendants, Ms. Mosby suffered loss of liberty, substantial physical pain, and emotional distress.

**DELIBERATE ACTS UNDER COLOR OF STATE LAW**

37. All of the aforementioned acts of the individual defendants, their agents,

servants and employees, were carried out under the color of state law in the course and scope of their duties.

38. All of the aforementioned acts deprived Plaintiff of the rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments of the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

39. The individual defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiff of her constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

**FAILURE TO TRAIN, SUPERVISE, AND DISCIPLINE**

40. Upon information and belief, the individual defendants' aforementioned abuse of power – in the forms of physical violence and mendacity – was not an isolated event. There were other instances of misconduct by the individual defendants that Defendant City knew or should have known about.

41. The NYPD failed to supervise and discipline the individual defendants despite their histories of malicious and mendacious behavior, ignoring the risk that they would engage in future misconduct, thereby encouraging them to continue to abuse their powers and violate the rights of civilians.

**NYPD'S CULTURE OF MENDACITY**

42. There is a systemic failure by the City to identify, discipline, and supervise NYPD officers who fabricate criminal charges, a failure so widespread, obvious, and tolerated as to constitute a policy-in-practice, custom, or usage of Defendant City.

43. The NYPD's flaccid response to lying officers – particularly in the context of filing false charges – constitutes a destructive custom and policy that fosters a culture of

mendacity in the NYPD.

44. The City has recognized the obvious and significant problem of police officers fabricating criminal charges, but there is no serious mechanism in place by which to curb such conduct or weed out dishonest officers.

45. Proportionate and appropriate discipline sends a message to NYPD officers that they are not above the law and are accountable to the people whom they serve.

46. But NYPD officers usually face only minor discipline or no discipline whatsoever for making false statement on court documents.

47. The Civilian Complaint Review Board ("CCRB") has no jurisdiction to investigate allegations of fabricated statements by NYPD officers in criminal court documents.  Investigating, controlling, and punishing this type of wrongdoing is the responsibility of the NYPD.

**THE NYPD'S SHAM FALSE STATEMENT POLICY**

48. In 1995, by Executive Order No. 18, Defendant City's Mayor created the Commission to Combat Police Corruption (the "Commission") to monitor and evaluate the NYPD's anti-corruption activities.  The Commission fulfills its mandate to monitor the NYPD's performance by reviewing the investigations of the Internal Affairs Bureau ("IAB"), and presenting its findings in its Annual Report.

49. Since its inception, the Commission has emphasized the importance of appropriately disciplining officers who make false statements.  On the basis of the Commission's recommendations, the NYPD has adopted a False Statement Policy (*see* NYPD Patrol Guide Section 203-08) that mandates termination of officers who intentionally make false official statements regarding a material matter, unless

exceptional circumstances exist.

50. As the Commission stated in its 2013 Annual Report, "Consistent application of the false statement policy is of utmost importance.  It not only enables members of the service to know what they can expect if they make false statements, but it also sends a clear message to members of the service, as well as the public, that the Department will not tolerate such conduct" (pg. 74).

51. The Commission analyzes false statements in official criminal court documents, including supporting depositions, criminal court complaints, summonses, and affidavits.  False statements in such documents are of paramount importance because they have the potential to unjustly deprive persons of their civil liberties and to destroy the lives of innocent people.

52. Despite the importance of appropriately identifying and punishing officers who make false statements, the NYPD rarely imposes discipline consistent with its stated policy of terminating officers.

53. Indeed, the gap between its practice and policy is so wide as to make the NYPD's False Statement Policy a sham.

54. For example, in the 2014 Annual Report, the Commission examined ten cases involving false statements in sworn court documents; in seven of those cases, the subject officers were found guilty by making false statements but not separated from the police department.

55. Such findings – which expose the gap between the NYPD's False Statement Policy and practice – can be found in virtually every Annual Report issued by the Commission.

56. Over the past ten years, in its Annual Reports, the Commission has analyzed numerous forms of false statements and has consistently found that the NYPD "fail[s] to follow its false statement policy"; "fail[s] to charge the subject officer with making a false statement although such a charge appear[s] appropriate"; levies "other similar charges…to avoid the imposition of the False Statement Policy's requirement of termination"; and creatively skirts the requirement of termination without an explanation by NYPD for departing from the requirement.

57. And there is no sign of improvement. Indeed, under Mayor de Blasio's administration, the NYPD seems more empowered than ever to thumb its nose at the False Statement Policy.

58. In its 2015 Report, the Commission found that the NYPD rarely brought charges under the False Statement provision. "Instead," the Commission reports, "the Department used other Patrol Guide sections to allege misconduct relating to false statements" (pg. 103) – sections which do not carry a presumption of termination.

59. The Commission's 2017 Report found that the NYPD has been charging officers with making false official statements in far fewer instances than facts and circumstances seem to warrant.

60. In the specific context of fabricated court documents that falsely accuse people of wrongdoing, the Commission has regularly found grossly inadequate punishments, resulting in guilty officers forfeiting vacation days (usually no more than 30 days) but rarely losing their jobs.

61. To make matters worse, the instances of false statements investigated by the IAB and analyzed by the Commission compose a small fraction of the total instances of

false statements that occur within the NYPD.

62. In the 2010 Annual Report, for instance, the Commission identified only ten IAB cases that included allegations of making an official false statement.

63. The officers who were caught fabricating statements were unlucky – they were captured on videotape, a civilian reported them, their lies were unwittingly exposed – but most dishonest police officers know they can lie and get away with it.

**"TESTILYING"**

64. On March 18, 2018, the New York Times published an article by Joseph Goldstein called "'Testilying' by Police: A Stubborn Problem," detailing the pervasive and largely ignored problem of police perjury. "Behind closed doors, we call it testilying," said NYPD officer Pedro Martinez in an interview for the article.

65. The article states: "An investigation by the New York Times found that on more than 25 occasions since January 2015, judges or prosecutors determined that a key aspect of New York City police officer's testimony was probably untrue. The Times identified these cases – many of which are sealed – through interviews with lawyers, police officers and current and former judges." Moreover, "[t]he 25 cases identified by The Times are almost certainly only a fraction of those in which officers have come under suspicion for lying in the past three years." "Still, the cases identified by The Times reveal an entrenched perjury problem several decades in the making that shows little sign of fading." The purpose of the perjury was "aimed at tilting the scales toward guilt."

**NYPD PROTECTS AND PROMOTES LYING OFFICERS**

66. On March 19, 2018, the New York Times published another article by Joseph

10

Goldstein entitled "Promotions, Not Punishments, for Officers Accused of Lying," reiterating the findings of the Commission and detailing a "culture of dishonesty."

67. The article states: "Of the 81 cases in which a civilian review board [the CCRB] found an officer had lied, the Police Department pursued 'false statement' charges in only two." In the other 79 cases, the NYPD found no wrongdoing or found the officer guilty of lesser misconduct.

68. The article also notes a problem with transparency and accountability when it comes to the NYPD's false statement policy: the NYPD is not required to tell the CCRB if it takes action against lying police officers. Thus, while the CCRB is aware of the 81 cases it has tracked since 2010, it – along with the public at large – is oblivious to the total number of cases in which officers have been found to lie and what their punishments are.

69. So while the NYPD may publicly extol its professionalism and integrity control, the NYPD cannot be trusted. Its indifference to truthfulness by its own rank and file – coupled with a lack of full transparency about how it handles lying officers – makes the department as a whole unworthy of trust.

**FAILURE BY THE CITY TO FIX THE CULTURE OF MENDACITY**

70. Defendant City has turned a blind eye to the thousands of criminal cases which are dismissed each year in the Criminal and Supreme Courts of Defendant City; has failed to study how many of those dismissals were due to baseless, fabricated charges; and has failed to proactively look for patterns of fabrication and identify charges that should have never been brought.

71. Defendant City has no system by which to proactively identify mendacious

officers.

72. In response to the "Testilying" phenomenon, for example, the City has failed to create any system for how prosecutors should document and keep track of internal evaluations of officer dishonesty. *See* "When Prosecutors Bury NYPD Officers' Lies" (*Gothamist)*, by George Joseph and Ali Winston (Sept. 17, 2019) ("Interviews with more than a dozen former prosecutors from Brooklyn, the Bronx, Queens, Staten Island, and Manhattan DA's offices, disclosure letters from the Manhattan DA's office, and a review of numerous cases suggests internal systems to track police misconduct are haphazard at best, and intentionally negligent at worst.").

73. In a criminal justice system where numbers and statistics have become paramount, the inadequacy of the NYPD's supervision and discipline with respect to dishonesty in the filing of criminal charges is exacerbated by the pressure on police officers to meet arrest quotas, or "performance goals."

74. Because arrests are rewarded, while making false arrests and fabricating charges go largely unpunished, police officers have felt incentivized to engage in false arrests and to fabricate criminal charges.

75. Such perverse incentives become particularly destructive in the hands of dishonest, undisciplined, unsupervised officers, such as the individual defendants.

76. Through the data cited herein along with hundreds of civil rights lawsuits alleging fabrication every year, the policymakers of Defendant City have been aware of the NYPD's practice of insufficiently punishing – and thereby encouraging – the fabrication of criminal charges.

77. By doing nothing about this practice, the City has demonstrated deliberate indifference to the rights of its residents.

78. The notion of police officers lying, cheating, fabricating, manipulating, and misleading has become so accepted and commonplace within the NYPD that the pursuit of justice, which is rooted in truth and fact, has become subverted and degraded. Consequently, police officers must operate in a police culture so truth-sick and cynical that their morale and morality are crushed. The negative incentives created by this sick culture threaten the safety, welfare, and liberty of every resident.

**DAMAGES**

79. As a direct and proximate cause of the said acts of the Defendants, Plaintiff suffered the following injuries and damages:

    a. Violation of her constitutional rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution;

    b. Physical pain and injury;

    c. Emotional trauma, distress, degradation, and suffering.

### SECTION 1983 CLAIMS

### FIRST CLAIM

**Denial of the Right to a Fair Trial Under Section 1983**

80. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

81. By the actions described, the Defendants deprived Plaintiff of her Fourth, Fifth, and Fourteenth Amendment rights to a fair trial.

82. The individual defendants deliberately forwarded fabricated information to the Manhattan District Attorney's Office.

83. As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

## SECOND CLAIM

### Excessive Force Under Section 1983

84. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

85. By the actions described, the individual defendants deprived Plaintiff of her Fourth Amendment right to be free of unreasonable or unwarranted restraints on personal liberty, specifically her right to be free from excessive and unreasonable force.

86. As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

## THIRD CLAIM

### False Arrest Under Section 1983

87. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

88. By the actions described above, Defendants deprived Plaintiff of her federal civil rights, including her Fourth Amendment right to be secure in her person against unreasonable searches and seizures, specifically her right to be free from false arrest.

89. As detailed above, the individual defendants intentionally arrested and detained Plaintiff without probable cause, without a warrant, without privilege or consent.

90. As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

## FOURTH CLAIM

### Failure to Intervene Under Section 1983

91. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

92. Each and every individual defendant had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of her constitutional rights by other law enforcement officers.

93. The individual defendants failed to intervene on Plaintiff's behalf to prevent, end, or truthfully report the violations of her constitutional rights despite knowing about such violations and having had a realistic opportunity to do so.

94. As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

## FIFTH CLAIM

### Municipal Liability Under Section 1983

95. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

96. By the actions described, the Defendant City deprived Plaintiff of her Constitutional rights through its failure to train, supervise, and discipline malicious and mendacious officers; and through its indifference to a culture of dishonesty among those who wield considerable power over the lives of everyday residents.

97. As a direct and proximate result of the acts of Defendant City, Plaintiff sustained the other damages and injuries hereinbefore alleged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands the following relief jointly and severally against the Defendants:

    a.    An order awarding compensatory damages for Plaintiff Maggalean Mosby in an amount to be determined at trial;

    b.    An order awarding punitive damages in an amount to be determined at trial;

    c.    A court order, pursuant to 42 U.S.C. § 1988, that Plaintiff is entitled to reasonable attorney's fees, costs and disbursements; and

    d.    Such other and further relief as this Court may deem appropriate.


DATED:    February 18, 2020　　　　　　　　　/s/
　　　　　　　New York, New York　　　　　　　CYRUS JOUBIN, ESQ.
　　　　　　　　　　　　　　　　　　　　　　　43 West 43rd Street, Suite 119
　　　　　　　　　　　　　　　　　　　　　　　New York, NY 10036
　　　　　　　　　　　　　　　　　　　　　　　(703) 851-2467
　　　　　　　　　　　　　　　　　　　　　　　joubinlaw@gmail.com
　　　　　　　　　　　　　　　　　　　　　　　Attorney for Maggalean Mosby